UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

KELVIN BURGOS *et al.,*
*individually and on behalf of*
*all those similarly situated,*

                                Plaintiffs,                            **REPORT AND**
                                                                       **RECOMMENDATION**
                                                                     15 CV 6840 (CBA) (CLP)

                    -against-

NORTHEAST LOGISTICS, INC. d/b/a
DILIGENT DELIVERY SERVICES,
JERRY CURCIO, and LARRY BROWNE,

                               Defendants.

------------------------------------------------------------ x

**POLLAK**, United States Magistrate Judge:

       On December 1, 2015, Kelvin Burgos, Pedro Acosta, Claudia Duque, Yendy Dominguez,

and Rafael Morel, on behalf of themselves and others similarly situated (collectively,

"plaintiffs"), commenced this action against Northeast Logistics (d.b.a. Diligent Delivery

Systems) ("Diligent"), Jerry Curcio, and Larry Browne (collectively, "defendants"), alleging

violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

Between February 3, 2016 and September 13, 2016, three additional plaintiffs filed notices of

consent to join this collective action.[1]

---

[1] Filipe De La Cruz filed a notice of consent to join the action on February 3, 2016; Jorge
Orozco Vega joined on April 13, 2016, and Miguel Dominguez j oined on September 13, 2016.

On March 18, 2016, defendants filed a motion to dismiss plaintiffs' complaint and to compel arbitration, citing an arbitration clause in a contract that each plaintiff signed with Diligent.

On March 30, 2017, the Honorable Carol B. Amon granted defendants' motion to compel arbitration with respect to the named defendants, but denied defendants' motion to dismiss. (Order[2] at 1, 13).  The court stayed the matter pending the outcome of arbitration.  (Id.)

On October 6, 2017, the parties notified the court that they had reached a settlement. Judge Amon referred review of the proposed Settlement Agreement ("Settlement Agreement" or "Agreement") to the undersigned on October 6, 2017, and the parties filed the fully executed Settlement Agreement for the Court's review on October 9, 2017.  (Agmt[3]).   On December 15, 2017, the parties submitted a letter to the Court, requesting the Court's approval of the Settlement Agreement.  (Ltr[4]).

 In light of the Second Circuit's decision in Cheeks v. Freeport Pancake House, courts are required to approve the fairness of settlements of claims brought under the FLSA.  796 F.3d 199, 206 (2d Cir. 2015); see also D.A. Schulte, Inc. v. Gangi, 328 U.S. 108, 113 (1947).

On December 21, 2017, a fairness hearing was held before the undersigned.  For the reasons set forth below, the Court respectfully recommends that the parties' proposed settlement be denied without prejudice to resubmit the Agreement with the changes outlined below.

---

[2] Citations to "Order" refer to the Honorable Carol Bagley Amon's Memorandum and Order, dated March 30, 2017.

[3] Citations to "Agmt" refer to the Settlement Agreement and Release, filed on October 9, 2017.

[4] Citations to "Ltr" refer to the Letter filed by counsel for Northeast Logistics, Inc. on December 18, 2017.

FACTUAL BACKGROUND

From May 2010 to December 1, 2015, when the Complaint was filed, the five named

plaintiffs in the Complaint allegedly worked for various periods of time as delivery drivers for

defendant Diligent, a company that specializes in providing delivery services for other

companies.  (Compl.[5] ¶¶ 3, 40).

Specifically, it is alleged that Kelvin Burgos began working for Diligent in May 2010.

Rafael Morel began working in April 2013; Claudia Duque began working in June 2013; Yendy

Dominguez began working in March 2014; and Pedro Acosta began working in May 2014.  (Id.

¶¶ 15, 20, 25, 30, 35).  At the time that the Complaint was filed, these plaintiffs—with the

exception of Yendy Dominguez—were still working for defendants.  (See id. ¶¶ 15, 20, 25, 30,

35).  The three plaintiffs who subsequently joined the collective action, Filipe De La Cruz, Jorge

Orozco Vega, and Miguel Dominguez, had been working for Diligent during the three years

preceding December 1, 2015.

Plaintiffs' responsibilities consisted of transporting merchandise for defendants' clients.

(Id. ¶ 4).  During their relationship with defendants, plaintiffs allege that they worked

significantly more than forty hours per week.  (Id. ¶ 5).  Plaintiffs allege that, during their time at

Diligent, Kelvin Burgos worked 63 hours a week; Pedro Acosta worked 53 hours a week;

Claudia Duque worked 63 hours a week; Yendy Dominguez worked 60.5 hours a week; and

Rafael Morel worked 60.5 hours a week.  (Id. ¶¶ 65, 77, 89, 101, 113).  In joining this collective

action, plaintiffs Filipe De La Cruz, Jorge Orozco Vega, and Miguel Dominguez also allege that

they worked hours in excess of 40 per week.  (Agmt at 1).

Plaintiffs brought this FLSA collective action "on behalf of all person who . . . worked

for Defendants at any point during the three years preceding the date the instant action was

---

[5] Citations to "Compl." refer to the Complaint, filed by Kelvin Burgos on December 1,
2015.

initiated." (Compl. ¶ 13).  Plaintiffs claim that defendants failed to pay them overtime, fixing

their pay at "a flat rate."  (Id. ¶ 8).  Plaintiffs further allege that defendants failed to pay them

minimum wage for all hours worked.  (Id. ¶ 2).  In sum, plaintiffs contend that defendants failed

to pay them overtime and minimum wages, in violation of the FLSA and the NYLL.  (Id.)

The parties note that there is a dispute as to whether plaintiffs qualify as employees for

the purposes of the FLSA or were independent contractors.  Defendants claim that plaintiffs

signed contracts classifying them as "independent owner operators," thus placing them outside

the reach of the FLSA.  (Ltr at 1).  Plaintiffs respond that despite the contracts signed, they had

an employee-employer relationship with defendants for the purposes of the FLSA.  (Compl. ¶ 6).

Supporting their argument, plaintiffs contend that "[a]t all relevant times Diligent Delivery

maintained control, oversight, and direction over plaintiffs and the FLSA collective including

timekeeping, payroll and other employment practices that applied to them."  (Id. ¶ 42).  As such,

plaintiffs claim that they were employees, not independent contractors, and well within the scope

of the FLSA.  (Id. ¶ 13).


DISCUSSION

I.     Compensation Amount

As set forth in the Settlement Agreement, the parties have agreed to settle all claims for

the sum of $47,000.  (Agmt ¶ 2).  The parties note that there is a dispute as to the number of

overtime hours per week that plaintiffs allegedly worked.  (Ltr at 2).  Plaintiffs contend that they

may have worked up to a maximum of 63 hours a week, while defendants contend that plaintiffs

worked a maximum of only 49 hours a week.  (Id.)

The parties indicate that $47,000 represents 100% of the *defendants'* estimation of

plaintiffs' overtime hours (that is, assuming a 49-hours-a-week maximum) plus 85% of the

maximum liquidated damages that would be recoverable, again using defendants' overtime

4

figures.  (Id.)  During the subsequent fairness hearing, plaintiffs' counsel explained that from the $47,000, $1,000 would be allocated for costs, and 1/3 of the remaining $46,000 would be allocated as attorney's fees, as per the standard practice in this district.  (Tr.[6] at 6).

The remainder of that, $30,442, would be divided between the eight plaintiffs, compensating them for their alleged unpaid overtime hours.  (Ltr at 2-3).  Kelvin Burgos would receive $5,237.33; Pedro Acosta would receive $5,892.00; Claudia Duque would receive $2,618.67; Yendy Dominguez would receive $655.00; Rafael Morel would receive $3,928.00; Filipe de la Cruz would receive $2,618.67; Jorge Orozco Vega would receive $5,237.00; and Miguel Dominguez would receive $4,255.33.  (Id.)  This information is summarized in the table below.

| Plaintiff | Time at Diligent | Settlement Amount |
|---|---|---|
| Kelvin Burgos | 5/2010—12/2015 | $5,237.33 |
| Pedro Acosta | 5/2014—12/2015 | $5,892.00 |
| Claudia Duque | 6/2013—12/2015 | $2,618.67 |
| Yendy Dominguez | 3/2014—some time prior to 12/2015 | $655.00 |
| Rafael Morel | 4/2013—12/2015 | $3,928.00 |
| Filipe De La Cruz | Between 2012—2015 | $2,618.67 |
| Jorge Orozco Vega | Between 2012—2015 | $5,237.00 |
| Miguel Dominguez | Between 2012—2015 | $4,255.33 |

Defendants' counsel notes that "[t]he settlement reached was a result of vigorous litigation and negotiations between competent counsel, following an open sharing of facts and information."  (Id.)

During the fairness hearing, plaintiffs' counsel acknowledged the advantages of accepting the settlement as opposed to going to arbitration.  First, if they went to arbitration, plaintiffs run the risk of recovering nothing if the arbitrator found that plaintiffs were

---

[6] Citations to "Tr." refer to the Transcript of Civil Cause for Fairness Hearing before the undersigned held on December 21, 2017.

independent contractors and not employees.  (Tr. at 3-4).  Moreover, defendants vigorously

contest plaintiffs' overtime figures and calculations.  (Ltr at 2).

  On the other hand, proceeding to arbitration would present risks for defendants as well.

Under their assumption that plaintiffs were merely independent contractors and not employees,

the defendants failed to maintain the necessary records.  As plaintiffs' counsel stated during the

fairness hearing, "[d]efendants have admittedly not the best records . . . maybe because they

consider themselves as . . . not anyone's employer, but an entity contracting to hire drivers[.]"

(Tr. at 4).  Defendants would, therefore, have difficulty rebutting plaintiffs' wage-and-hour

figures at arbitration, if the plaintiffs were found to be employees.  Further, defendants

acknowledge that "plaintiffs' damage calculations are likely higher" than their own calculations.

(Ltr at 3).  In light of these factors, defendants[7] ask the Court to find the Settlement Agreement

fair and reasonable.  (Id.)

  However, the Court has several concerns about the proposed compensation amount.

First, defendants have failed to justify why the Court should exclusively rely on defendants'

overtime figures as opposed to plaintiffs' overtime figures.  This is an especially problematic

omission in light of the up to 14-hour discrepancy between the parties' hours-per-week

calculations.  (Compare Compl. ¶¶ 69, 85, with Ltr at 2).  Second, the parties do not explain the

methodology used to determine the specific monetary awards for each of the eight plaintiffs.

Indeed, defendants' counsel notes that "Defendants were not involved with the allocation of the

settlement payment among the Plaintiffs [.]" (Ltr at 2).  In this letter, authored only by

defendants, there is no mention of the methodology plaintiffs' counsel used to divide up the

settlement award among the eight plaintiffs.  For example, the parties do not explain the

---

[7] As will be described in detail infra, while the letter refers to the parties' joint agreement, the letter is signed by defendants' counsel only and seems to have had minimal suggestions or input by plaintiffs' counsel.

significant difference in awards for Yendy Dominguez and Rafael Morel, who are each alleged to have worked 60.5 hours a week.[8]  Moreover, apart from a general assertion that they worked more than 40 hours per week, the parties have not provided any information to explain the settlement amounts awarded to the three opt-in plaintiffs, Filipe De La Cruz, Jorge Orozco Vega, and Miguel Dominguez, who joined the collective action after the five original plaintiffs. Defendants' counsel notes that "a formula similar to that utilized by Defendant in this case was approved by Magistrate Judge Levy" in a different case.[9]  However, without additional information as to the formula or the methodology used to divide the settlement award among the eight plaintiffs, the Court cannot determine whether the proposed settlement is fair and reasonable to the individual plaintiffs.[10]  Additional areas of concern are addressed below.

## II.   General Release Language

The Settlement Agreement contains a mutual general release provision.  It provides that, as part of the settlement, plaintiffs will release defendants from "any and all actions . . . known or unknown, suspected or unsuspected, foreseen or unforeseen . . . that occurred from the beginning of the world through the date of their execution of their agreement that are premised in whole or

---

[8] One explanation may be that Yendy Dominguez stopped working for defendants much earlier than Rafael Morel.  However, without additional information from the parties, the Court does not hazard a guess as to these circumstances.

[9] Although counsel refers the Court to a docket entry approving the parties' agreement in Cando v. Big City Automotive, et al., No. 16 CV 01154, that reference provides the Court with scant guidance as to the Honorable Robert M. Levy's rationale in approving the settlement in that case.  Moreover, aside from citing Cando, counsel has not provided the Court with any clarity as to the formula's methodology, nor has counsel explained why the Cando formula is relevant to the case at hand.

[10] Additionally, to assess the fairness of the Settlement, the Court should be able to compare the amount demanded by each plaintiff with the amount each plaintiff receives under the Settlement.  The Court should also, ideally, be able to compare plaintiffs' hours-per-week figures with defendants' figures.  However, aside from a general assertion that plaintiffs could not have worked more than 49 hours per week, defendants have not provided the Court with their hours-per-week figures for each plaintiff.

in part on an allegation of employee status."  (Agmt ¶ 5).  This provision is not limited to wage-and-hour issues.  It seeks to release defendants from all sorts of claims including "discrimination, harassment . . . unjust enrichment . . . fraud"—in total, more than a dozen causes of action.  (Id.) In return, defendants agree to release plaintiffs from "any and all claims, charges, actions, and causes of action of any kind or nature that Defendants once had, could have had, or now have arising out of Plaintiffs' alleged employment with the Defendants[.]"  (Id. ¶ 6).

Courts in this Circuit have generally disapproved of overbroad releases.  See, e.g. Camacho v. Ess-A-Bagel, Inc., No. 14 CV 2592, 2014 WL 6985633, at *4 (S.D.N.Y. Dec. 11, 2014) (characterizing general release provision that "purport[s] to waive any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to wage-and-hour issues" as "far too sweeping to be 'fair and reasonable'"); Bukhari v. Senior, No. 16 CV 9249, 2018 WL 559153, at *1 (S.D.N.Y. Jan. 23, 2018) (rejecting FLSA settlement containing a release provision that "would require [plaintiff] to waive any claim of any kind, known or unknown, that he might ever have had against defendants 'arising from or concerning in any way [plaintiff's] employment by or association with [d]efendants'" as impermissibly overbroad).  As the court in Mobley v. Five Gems Mgmt. Corp. recently noted, "[r]elease clauses may not 'purport to waive practically any possible claim against the defendants, including unknown claims and claims that have no relationship whatsoever to wage-and-hour issues.'"  No. 17 CV 9448, 2018 WL 1684343, at *3 (S.D.N.Y. Apr. 6, 2018) (quoting Lopez v. Nights of Cabiria, LLC, 96 F. Supp. 3d 170, 181 (S.D.N.Y. 2015)).  A strong policy rationale arising from the uniqueness of the FLSA context militates against the approval of overbroad releases.  Whereas courts in this Circuit have found fault with overbroad releases in the class action context, in the FLSA context, where courts are tasked with an "obligation to

8

police unequal bargaining power between employees and employers[,]" such releases are "doubly problematic[.]"  Id.

However, when general releases are reciprocal, courts in this Circuit have been more tolerant.  Thus, in Souza v. 65 St. Marks Bistro, No. 15 CV 327, 2015 WL 7271747, at *5 (S.D.N.Y. Nov. 6, 2015), the court indicated the reciprocal nature of a mutual general release provision would ameliorate some of the problems present in a one-sided general release provision.  The Souza court explained that a mutual general release, as opposed to a one-sided general release, "will ensure that both the employees and the employer are walking away from their relationship up to that point in time without the potential for any further disputes."  Id. Thus, the court found that such releases are "consistent with the goals of a fair and just settlement."  Id.  See also Lola v. Skadden, Arps, Meagher, Slate & Flom LLP, No. 13 CV 5008, 2016 WL 922223, at *2 (S.D.N.Y. Feb. 3, 2016) (approving FLSA settlement agreement in which "the Settlement provides for both a waiver of claims against Defendants and a waiver of claims against Plaintiffs, assuaging concerns that the waiver unfairly benefits only Defendants").

In Lopez v. Poko-St. Ann L.P., 176 F. Supp. 3d 340, 344 (S.D.N.Y. 2016), the court emphasized two limiting conditions that would have to be met for mutual general releases to be acceptable.  First, it would only approve of such releases in the non-class-action context where "at least one of the dangers posed by an overbroad release—that it would bind class members who had no bargaining power concerning the settlement terms—is not present[.]"  (Id.)  Second, it would only approve such releases where "plaintiffs . . . are no longer employees of the defendants, reducing the danger that the release was obtained through improper job-related pressure."  (Id.)

9

However, even when these conditions are met, some courts have added an extra layer to the reciprocity requirement, requiring not only reciprocity in the terms of the release but also requiring reciprocity of parties.  Thus, courts have found settlement agreements that require plaintiffs to release claims against not only the named defendants, but *also* against a broad array of defendants' connections, while only requiring defendants themselves to release plaintiffs, as too one-sided to be genuinely mutual.  In other words, these courts have found that reciprocity of claims, without reciprocity of parties, is incomplete reciprocity.

In Flores v. Hill Country Chicken NY, LLC, No. 16 CV 2916, 2017 WL 3448018, at *2 (S.D.N.Y. Aug. 11, 2017), the court rejected a release that sought to have plaintiffs release defendants together with "a broad array of persons" including "former employees, members, and shareholders" from liability.  By contrast, under the release, defendants *alone* were releasing plaintiffs.  In rejecting this release, the court reasoned that "the fact that plaintiffs release a number of persons other than defendants, yet it is only defendants that release plaintiffs, indicates that the release is not truly mutual."  Id. at *2 n.2.  Additionally, in Guzman v. Kahala Holdings, LLC, No. 15 CV 9625, 2017 WL 4748389, at *2 (S.D.N.Y. Oct. 18, 2017), the court rejected a release that was lopsided with respect to the parties on the same grounds.  See also Washington v. Elegante Servs., No. 17 CV 02328, 2018 U.S. Dist. LEXIS 37638, at *8-9 (S.D.N.Y. Mar. 6, 2018) (noting that "releases must be symmetric. . . . Thus, if defendants' 'executors, . . . agents, fiduciaries, representatives, and assigns' . . . are to be released, then defendants' release should likewise extend to plaintiffs' 'executors, . . . agents, fiduciaries, representatives, and assigns'[.]").  The courts in Flores v. Hill Country Chicken NY, LLC, Guzman v. Kahala Holdings, LLC, and Washington v. Elegante Servs., distinguished their cases

from Souza v. 65 St. Marks Bistro, 2015 WL 7271747, based on the fact that the Souza agreement did not release a broad array of parties.[11]

The courts in Flores and Guzman grounded their holdings in language found in Lopez v. Poko-St. Ann L.P., 176 F. Supp. 3d 340, 344.  The release at issue in that case had plaintiff release not only defendants, but also their "present and former leasees, parent corporations, tax or credit syndicators . . . and their current and former employees, investors, partners, tenants, residents, attorneys, officers . . . directors and agents[.]"  In rejecting the settlement agreement, the court in Lopez was concerned that such a release "could be applied to absurd effect, barring (for example) a personal injury suit arising out of an automobile accident where the at-fault driver turned out to be a former investor in one of Poko's syndicators."  Id. at 344-345.  The court in Guzman, too, was worried that if it would uphold the release at issue, "plaintiffs would not be able to sue defendants' former employees for breach of contract or for an assault." Guzman v. Kahala Holdings, LLC, 2017 WL 4748389, at *2.  In rejecting the settlement agreement, the court declared such a result "absurd, and contrary to the FLSA's remedial purposes."  Id.

Here, plaintiffs are not bringing this FLSA action on behalf of a class, thus reducing the risk that defendants are using an overbroad, general release to bar the claims of potential class

---

[11] In the fairness hearing in the instant case, the parties referred the Court to Souza on numerous occasions.  Plaintiffs' counsel noted:  "And if you see paragraph 6 [of the Settlement Agreement], defendants are releasing the exact same claims that plaintiffs are releasing. . . . And I think this is a decision. . . . It's called Souza v. St. Marks Bistro. . . . quoted by a lot of courts in both the Southern and the Eastern Districts and Judge Sullivan said because both parties at the end of the day get a benefit out of the mutual release, that it is—it's reasonable[.]"  (Tr. at 9). However, as Souza did not address a release extending to a broad array of parties, it is distinguishable from the case at hand.

members.  See Souza v. 65 St. Marks Bistro, 2015 WL 7271747, at *22.  Furthermore,

defendants' counsel have represented that plaintiffs are "no longer associated with Northeast

Logistics."  (Tr. at 7).  Therefore, concerns that plaintiffs signed an overbroad release in response

to job-related pressure are lessened.  See Lopez v. Poko-St. Ann L.P., 176 F. Supp. 3d 340 at

344.  As such, the release satisfies the two conditions under which some courts typically approve

of mutual general releases.

However, like the releases in Flores, Guzman, and Washington, the release here is

asymmetrical with respect to the parties.  It would have "[p]laintiffs, on behalf of themselves,

and their agents, assigns, attorneys, heirs, successors, executors, and administrators," release a

broad array of "Releasees" defined to include "Diligent, its parent, subsidiaries, division,

affiliates, commonly owned entities and other related entities, Diligent's customers . . . and each

of their incumbent and former officers, directors, owners, shareholders, investors, agents,

attorneys, employees, fiduciaries, successors, assigns, and representatives," while having

"defendants"—by themselves—"release plaintiff."  (Agmt ¶¶ 5, 6).  Thus, the release in this

Settlement Agreement is not truly mutual.

Accordingly, the Court respectfully recommends that unless the parties revise the general

release provision of their Settlement Agreement to reflect these concerns, the settlement should

not be approved as fair and reasonable.[12]

---

[12] Parties have dealt with similar concerns in a number of ways.  See, e.g. Chowdhury v.
Brioni Am., Inc., No. 16 CV 344, 2017 WL 5125535, at *3 (S.D.N.Y. Nov. 1, 2017) (". . . if
defendants seek a general release from plaintiffs in favor of defendants' insurers, the release can
be fairly characterized as mutual only if defendants' insurers provide a reciprocal general release
in favor of plaintiffs"); Washington v. Elegante Servs., 2018 U.S. Dist. LEXIS 37638, at *9
(S.D.N.Y. Mar. 6, 2018) ("Thus, if defendants' 'executors, . . . agents, fiduciaries,
representatives, and assigns' . . .  are to be released, then defendants' release should likewise

III.    Limitation of Future Employment Provision

The Settlement Agreement contains a provision titled "No Future Employment Relationship."  (Agmt ¶ 8).  In this provision, each plaintiff stipulates that if he or she wishes to continue having a relationship with Diligent it will only be "as an independent contractor and not as an employee."  (Id.)  In seeking a future term as an independent contractor, each plaintiff agrees to "neither seek nor accept any wages, overtime, expense reimbursement or other payments attributable to his/her status as an employee."  (Id.)  Bolstering these restrictions, the provision would impose a penalty on any plaintiff who asserts employee status in any future legal action against defendants:  "If any Plaintiff asserts employee status in any action against any Releasee, Plaintiff shall immediately return to Diligent all amounts paid to Plaintiff under this Agreement, plus the legal fees, if any, reasonably incurred by Releasees in defending the Action and enforcing this Agreement."  (Id.)

Courts in this Circuit have consistently rejected FLSA settlements that seek to prevent plaintiffs from having a future employment relationship with the defendant as contrary to the underlying aims of the FLSA.  See Baikin v. Leader Sheet Metal, Inc., No. 16 CV 8194, 2017 WL 1025991, at *1 (S.D.N.Y. Mar. 13, 2017) (indicating that a Settlement Agreement that "purports to forever bar plaintiff from working . . . with Defendants" is "in strong tension with the remedial purposes of the FLSA") (citation and internal quotation marks omitted).

---

extend to plaintiffs' "executors, . . . agents, fiduciaries, representatives, and assigns'[.]"); Pinguil v. YTF Hair Extensions Inc., No. 16 CV 8359, 2018 U.S. Dist. LEXIS 26010, at *9 (S.D.N.Y. Feb. 15, 2018) (". . . the release of defendants should unambiguously extend only to persons or entities acting on behalf of or in privity with defendants themselves, and as to such persons or entities must be limited to claims arising from actions taken in their capacity as such."); De Jesus Galindo v. BLL Rest. Corp., No. 15 CV 5885, 2018 WL 1684412, at *2 (S.D.N.Y. Apr. 6, 2018) ("The parties must limit . . . the persons . . . to which the release applies.")

13

Furthermore, courts in this Circuit have disapproved of settlement language that would set conditions on future employment relationships. See, e.g. Leon-Martinez v. Cent. Cafe & Deli, No. 15 CV 7942, 2017 WL 1743935, at *2 (S.D.N.Y. Apr. 13, 2017) (noting that "[a] provision limiting plaintiffs' employment opportunities is not acceptable") (citation omitted); Bao Cheng Fu v. Mee May Corp., No. 15 CV 4549, 2017 WL 2172910, at *3 (S.D.N.Y. Mar. 31, 2017) (holding that "a provision limiting plaintiffs' employment opportunities is unacceptable" and "is in direct conflict with the FLSA's 'primary remedial purpose: to prevent abuses by unscrupulous employers, and remedy the disparate bargaining power between employers and employees'") (quoting Cheeks v. Freeport Pancake House, 796 F.3d 199 at 207).

In this case, while the provision at issue does not prohibit plaintiffs from maintaining an "independent contractor" relationship with defendants, it explicitly spells out the numerous ways (e.g. loss of overtime pay and loss of expense reimbursement) in which defendants purport to limit plaintiffs' future employment opportunities. Furthermore, to induce compliance with these restrictions, defendants would have plaintiffs forfeit all compensation received in the Settlement Agreement should plaintiffs ever assert employee status in a future action against any Releasee. As the courts in Leon-Martinez v. Cent. Cafe & Deli 2017 WL 1743935, at *2 and Bao Cheng Fu v. Mee May Corp., 2017 WL 2172910, at *3 make clear, any provision that seeks to limit plaintiffs' employment opportunities is unacceptable and inconsistent with the aims of the FLSA.

Accordingly, the Court recommends that the parties remove or substantially revise the provision titled "No Future Employment Relationship" from the Settlement Agreement.

IV.     Attorney's Fees and Costs

As for attorney's fees, counsel represents that of the $47,000 settlement amount, $1,000 would be allocated toward costs, and the 1/3 of the remaining $46,000 would be allocated for attorney's fees.  (Tr. at 6).

Counsel notes that attorney's fees of 33% on FLSA and NYLL claims are routinely approved by courts within the Second Circuit.  See, e.g., Calle v. Elite Specialty Coatings Plus, Inc., No. 13 CV, 2014 WL 6621081, at *3 (E.D.N.Y. Nov. 21, 2014) (approving settlement of FLSA and NYLL claims and noting that a "one-third contingency fee is a commonly accepted fee in this Circuit"); Rangel v. 639 Grand St. Meat & Produce Corp., No. 13 CV 3234, 2013 WL 5308277, at *1 (E.D.N.Y. Sept. 19, 2013) (indicating that attorney's fees of 1/3 of FLSA amount are "routinely approved by Courts in this Circuit").

However, some courts have still felt it necessary to independently verify the reasonableness of the attorney's fees requested.  Thus, even when the percentage method is used, and even when counsel requests a percentage consistent with the routine practice of this Circuit, these courts would still "cross-check" the reasonableness of the fees calculated under the percentage method, by independently calculating the fees under the lodestar method and comparing the two figures.  See Mobley v. Five Gems Mgmt. Corp., 2018 WL 1684343, at *4 (holding that "[e]ven where attorney's fees are calculated with the percentage method" courts "must still independently ascertain the reasonableness of the requested fees" and "perform a lodestar 'cross-check'" in which "[t]hey compare the fees generated by the percentage method with those generated by the lodestar method."); In re Citigroup Inc. Sec. Litig., 965 F. Supp. 2d 369, 388 (S.D.N.Y. 2013) (noting that courts should make "a comparison of the lodestar to the fees awarded pursuant to the percentage of the fund method [a]s a cross-check") (citation and internal quotation marks omitted).

Accordingly, the Court respectfully recommends that counsel provide time sheets and the appropriate documentation so that the Court may perform a lodestar cross-check to verify the reasonableness of the attorney's fees requested.  Similarly, the Court recommends that counsel provide additional documentation to explain the request for costs incurred in this action.

<u>CONCLUSION</u>

Having reviewed the parties' submissions and the Settlement Agreement, conducted a fairness hearing with the parties, and being familiar with the issues involved in this case, the Court respectfully recommends denying the motion to approve the Settlement Agreement without prejudice to resubmit the Agreement with the changes outlined above, and with further explanation as to the methods used to calculate and distribute the award among the plaintiffs, as well as time sheets and appropriate documentation as to the attorney's fees and costs requested.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; <u>Caidor v. Onondaga Cty.</u>, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      April 26, 2018

                              _____/s/ Cheryl L. Pollak_____
                              Cheryl L. Pollak
                              United States Magistrate Judge
                              Eastern District of New York

16