UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
KELVIN BURGOS et al., *individually and on behalf of all those similarly situated*,

                Plaintiffs,

    -against-

NORTHEAST LOGISTICS, INC. d/b/a
DILIGENT DELIVERY SERVICES, JERRY
CURCIO, and LARRY BROWNE,

                Defendants.
----------------------------------------------------------X

**REPORT AND RECOMMENDATION**
15 CV 6840 (CBA) (CLP)

**POLLAK**, United States Magistrate Judge:

    This wage and hour action was commenced on December 1, 2015 by Kelvin Burgos, Pedro Acosta, Claudia Duque, Yendy Dominguez, and Rafael Morel, on behalf of themselves and other similarly situated employees (collectively, "plaintiffs") of defendants Northeast Logistics, d/b/a Diligent Delivery Systems ("Diligent"), Jerry Curcio, and Larry Browne (collectively, "defendants"), alleging violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). Pending before this Court on referral from the Honorable Carol Bagley Amon is the parties' joint motion to approve the Revised Settlement Agreement in accordance with Cheeks v. Freeport Pancake House, 796 F.3d 199, 206 (2d Cir. 2015), cert. denied, 136 S. Ct. 824 (2016).

    For the reasons set forth below, the Court respectfully recommends that, because certain provisions of the Revised Settlement Agreement still fail to satisfy the requirements of Cheeks v. Freeport Pancake House, the proposed revised settlement be denied without prejudice to resubmit the Agreement with the changes outlined below.

FACTUAL AND PROCEDURAL BACKGROUND

The Court assumes familiarity with this case, the procedural posture of which was described most recently in this Court's April 26, 2018 Report and Recommendation, adopted by Judge Amon. (See 4/26/2018 R&R[1] at 1-4). The Complaint alleges that the named plaintiffs worked for various periods of time as delivery drivers for defendant Diligent, a company specializing in providing delivery services for other entities. (Compl.[2] ¶¶ 3, 40). Although each of the named plaintiffs alleged that he or she worked a different number of hours each week, they all claimed that they worked significantly more than forty hours per week. (Id. ¶ 5). They alleged that defendants failed to pay them minimum wage for all hours worked and failed to pay them overtime, fixing their pay at "a flat rate," in violation of the FLSA and the NYLL. (Id. ¶¶ 2, 8). In bringing this FLSA collective action, plaintiffs sought to represent "all persons . . . who worked for [d]efendants at any point in the three years preceding the date the instant action was initiated." (Id. ¶ 13).

Although the parties disputed whether plaintiffs were employees for the purposes of the FLSA rather than "independent owner operators" (12/18/17 Ltr.[3] at 1), on October 6, 2017, the parties notified the Court that they had reached a settlement. Judge Amon referred review of the proposed settlement agreement to the undersigned, and the parties filed the fully executed Settlement Agreement for the Court's review on October 9, 2017. (See 10/9/17 Sett. Agr.[4]). This Court held a fairness hearing and issued a Report and Recommendation, dated

---

[1] Citations to "4/26/2018 R&R" refer to the Report and Recommendation, issued by this Court on April 26, 2018.
[2] Citations to "Compl." refer to the Complaint, filed by plaintiffs on December 1, 2015.
[3] Citations to "12/18/17 Ltr." refer to defendants' letter filed on December 18, 2017.
[4] Citations to "10/9/17 Sett. Agr." refer to the Settlement Agreement and Release, filed by plaintiffs on October 9, 2017.

2

April 26, 2018, recommending that the Settlement Agreement not be approved, but without prejudice to resubmit it after addressing certain issues. (See 4/26/2018 R&R at 16). In recommending denial, the Court identified four primary areas of concern: (1) counsel had failed to provide "information as to the formula or the methodology used to divide the settlement award among the eight plaintiffs;" (2) the general release provision included overly broad language; (3) the provision entitled "No Future Employment Relationship" was contrary to the FLSA's purposes of remedying labor disputes without consequences for future employment; and (4) counsel had not provided the appropriate documentation for the Court to verify the reasonableness of the attorney's fees and costs requested. (4/26/2018 R&R at 7, 12, 14, 16).

On May 18, 2018, the parties submitted a Revised Settlement Agreement and several exhibits. (See 5/18/18 Ltr.[5]). On May 23, 2018, Judge Amon referred review of the Revised Settlement Agreement to the undersigned. (See Electronic Order, dated May 23, 2018, ECF No. 70).

In reviewing plaintiffs' cover letter of May 18, 2018 and the Revised Settlement Agreement, the Court recognizes that some of the concerns raised in the April Report and Recommendation have been addressed, but others—namely, the formula and calculation of the individual compensation amounts and the general release language—remain problematic.

## DISCUSSION

A. <u>Compensation Amount</u>

The Revised Settlement Agreement proposes the same settlement sum and distribution

---

[5] Citations to "5/8/18 Ltr." refer to plaintiffs' letter in accordance with this Court's Report and Recommendation, filed on May 8, 2018. Appended to the letter are several exhibits, including the Revised Settlement Agreement.

3

as did the original Settlement Agreement of October 9, 2017. Under both Agreements, the parties agreed to settle the claims of all plaintiffs[6] for the sum of $47,000, with $15,220.50 set aside for attorney's fees and $1,337.50 for costs. (See 5/18/18 Ltr. at 1). The remaining $30,442.00 would be distributed among the eight plaintiffs. Plaintiffs explain that under the Revised Settlement Agreement, Kelvin Burgos would receive $5,237.33; Pedro Acosta would receive $5,892.00; Claudia Duque would receive $2,618.67; Yendy Dominguez would receive $655.00; Rafael Morel would receive $3,928.00; Filipe de la Cruz would receive $2,618.67; Jorge Orozco Vega would receive $5,237.00; and Miguel Dominguez would receive $4,255.33. (5/18/18 Ltr. at 1; see also 12/18/17 Ltr. at 2 (setting forth the same distribution plan)).

Since the proposed distribution of the settlement amount has not changed from the original Settlement Agreement, the table summarizing the information included in the initial Report and Recommendation remains applicable:

| Plaintiff | Time at Diligent | Settlement Amount |
|---|---|---|
| Kelvin Burgos | 5/2010—12/2015 | $5,237.33 |
| Pedro Acosta | 5/2014—12/2015 | $5,892.00 |
| Claudia Duque | 6/2013—12/2015 | $2,618.67 |
| Yendy Dominguez | 3/2014—some time prior to 12/2015 | $655.00 |
| Rafael Morel | 4/2013—12/2015 | $3,928.00 |
| Filipe De La Cruz | Between 2012—2015 | $2,618.67 |
| Jorge Orozco Vega | Between 2012—2015 | $5,237.00 |
| Miguel Dominguez | Between 2012—2015 | $4,255.33 |

The April Report and Recommendation expressed several concerns about the compensation amount as specified in the initial Settlement Agreement, emanating from the

---

[6] For purposes of settlement, "plaintiffs" include the five original named plaintiffs, plus the three opt-in plaintiffs, Filipe De La Cruz, Jorge Orozco Vega, and Miguel Dominguez.

4

parties' failure to explain the methodology used: a) to determine the total settlement sum;[7] b) to determine the distribution of the settlement among the eight plaintiffs; and c) to systematically consider evidence in support of each plaintiff's claim of employee status, as opposed to independent contractor status, and to define the types of evidence that might support such a claim.

1. Calculation of the Total Settlement Amount

The May 18, 2018 letter attempts to explain the strategy for determining the monetary awards for each of the eight plaintiffs. Specifically, the letter explains that the damage calculations determined by plaintiffs' counsel's office "were used as an initial point of reference." (5/18/18 Ltr. at 2). Plaintiffs' counsel "then reviewed [d]efendants' records and damage calculations (derived from those records) and adjusted the distribution of settlement amounts to each [p]laintiff based on these records." (Id.)

Exhibit C to the May 18, 2018 letter includes a table that summarizes and compares the damage calculations. (See 5/18/18 Ltr., Ex. C). The chart sets forth plaintiffs' damage calculations, the relative distribution based on plaintiff's calculations, defendants' damage calculations, and the relative distribution based on defendants' calculation. In the final column, the actual distribution for each plaintiff is provided. For ease of reference, Exhibit C is shown below:

---

[7] The parties disputed the number of overtime hours each plaintiff worked and neither defendants nor plaintiffs had accurate records. (4/26/18 R&R at 4; see also 5/18/18 Ltr. at 2).

| | Plaintiffs' damage calculations | Defendants' damage calculations | Relative distribution (based on Plaintiffs' calculations) | Relative distribution (based on Defendants' calculations) | Actual Distribution |
|---|---|---|---|---|---|
| Felipe De la Cruz | $ 51,041.92 | $ 8,617.94 | $ 2,152.77 | $ 5,147.08 | $ 2,618.67 |
| Jorge Orozco Vega | $ 91,111.66 | $ 16,382.76 | $ 3,842.77 | $ 9,784.64 | $ 5,237.00 |
| Kelvin Burgos | $ 175,706.63 | $ 6,471.70 | $ 7,410.69 | $ 3,865.24 | $ 5,237.33 |
| Pedro Acosta | $ 93,624.12 | $ 6,110.36 | $ 3,948.74 | $ 3,649.43 | $ 5,892.00 |
| Rafael Morel | $ 98,220.29 | $ 4,173.82 | $ 4,142.59 | $ 2,492.82 | $ 3,928.00 |
| Yendy Dominguez | $ 22,622.06 | $ 117.04 | $ 954.12 | $ 69.90 | $ 655.00 |
| Claudia Duque | $ 75,402.41 | $ 2,336.48 | $ 3,180.21 | $ 1,395.47 | $ 2,618.67 |
| Miguez Dominguez | $ 114,047.57 | $ 6,760.00 | $ 4,810.13 | $ 4,037.42 | $ 4,255.33 |
| | | | | | |
| TOTALS: | $ 721,776.66 | $ 50,970.10 | | | $ 30,442.00 |

The original Report and Recommendation's first concern with the compensation amount was that "[d]efendants have failed to justify why the Court should exclusively rely on defendant's overtime figures as opposed to plaintiff's overtime figures." (4/26/18 R&R at 6). The May 18, 2018 letter does not adequately address this first concern. Plaintiffs attach their damage calculations, articulating in their letter that their calculations were "generally not very accurate [because] . . . these calculations were based entirely on Plaintiff's estimates of dates and hours." (5/18/18 Ltr. at 2). However, the exhibits attached to the letter do not explain the extent to which counsel based damage calculations on defendants' overtime figures, instead of on plaintiffs' estimates to reach the actual distribution. (See id., Exs. A-C[8]). For example, in the case of Jorge Orozco Vega, plaintiffs calculated his damages at $91,111.66, and defendants calculated his damages at $16,385.76, yet his actual distribution is only $5,237.00. (Id.) In the case of Felipe De la Cruz, plaintiffs calculated his damages at $51,041.92, and defendants calculated his damages at $8,617.94, yet his actual distribution is $2,618.67. (Id.) The parties do not adequately explain why plaintiffs are receiving less than the amount that defendants

---

[8] Exhibit A is the Revised Settlement Agreement; Exhibit B sets forth plaintiffs' damage calculations; and Exhibit C contains summaries and comparisons of the plaintiffs' and defendants' respective damage calculations.

6

acknowledge they owe. Given the large disparity between plaintiffs' and defendants' calculations of their overtime figures, the fairness of the settlement distribution remains in question.

Moreover, the methodology for determining the relative distribution figures remains unclear. Beyond expressing that plaintiffs' relative distribution figures, for example, are "based on plaintiffs' calculations" (id.), plaintiffs fail to explain the method for using the damage calculations to arrive at the relative distribution figures. As shown above, the table also provides a column entitled "Defendants' damage calculations" (id.), but defendants do not explain how they used their damage calculations to arrive at their relative distribution figures.

Accordingly, the Court recommends that counsel provide an explanation of precisely how the relative distribution figures specified in Exhibit C of plaintiffs' letter were determined, as well as how the actual distribution figures were reached.

2. Calculation of Monetary Awards for Each Plaintiff

As discussed above, the April Report and Recommendation indicated that "the parties do not explain the methodology used to determine the specific monetary awards for each of the eight plaintiffs." (4/26/18 R&R at 6). As an example of this deficiency, the Report and Recommendation pointed out that "the parties do not explain the significant difference in awards for Yendy Dominguez and Rafael Morel, who are each alleged to have worked 60.5 hours a week."[9] (Id. at 6-7).

The Revised Settlement Agreement provides a partial response to this concern. Plaintiffs explain that Yendy Dominguez worked at Diligent for 7 months and 25 days and worked 15 hours of overtime per week, while Rafael Morel worked at Diligent for 1 year, 11 months, and

---

[9] Yendy Dominguez is awarded $655.00, while Rafael Morel is awarded $3,928.00.

21 days and worked 26 hours of overtime per week. Plaintiffs' damage calculations demonstrate that the difference in the amount awarded to Yendy Dominguez and that awarded to Rafael Morel can be partially attributed to the difference in the duration of employment and the number of overtime hours between Yendy Dominguez and Rafael Morel, respectively. (See 5/18/18 Ltr., Ex. B).

However, the Court remains concerned that the Revised Settlement Agreement and the attached exhibits still fail to provide adequate insight into the method used for reaching the distribution proposed in the Revised Settlement Agreement. An example of the type of seemingly disproportionate settlement allocation motivating the Court's concern is the awards proposed for Jorge Orzoco Vega and Kelvin Burgos, respectively. As reflected in Exhibit B, Vega worked at Diligent for 3 years, 6 months, and 8 days and worked 13 hours overtime per week. (5/18/18 Ltr., Ex. B). His award, according to the actual distribution figure, is $5,237.00. (Id., Ex. C). Burgos worked for Diligent for 5 years, 7 months, and 3 days, worked 16 hours overtime per week, and yet, he is awarded essentially the same amount, $5,237.33. (Id., Exs. B-C). In other words, Vega—who worked at Diligent for 2 years and 25 days fewer than Burgos did and who worked fewer hours overtime per week than Burgos did—will be awarded only 33 *cents* less than Burgos. Counsel does not explain this disproportionality.

Based upon the Court's independent calculations, it appears that, in the case of each of the plaintiffs, the ratio between the "Relative distribution (based on plaintiffs' calculations)" to "Plaintiffs' damage calculations" remains at a constant .04217. (See id., Ex. C). In other words, the result obtained by dividing the "relative distribution (based on plaintiffs' calculations)" by the "Plaintiffs' damage calculations" is .04217 in each case. For example, Felipe De la Cruz's award under the "Relative distribution (based on Plaintiffs' calculations)" column is $2,152.77

and his award under the "Plaintiffs' damage calculations" column is $51.041.92. (See Ex. C). The quotient of these figures is .04217. The same is true for each plaintiff's award under the relative distribution column and "Plaintiffs' damage calculations" column.

However, plaintiffs did not inform the Court that a ratio of .04217 was applied to determine the relative distribution figures, nor have they explained the rationale for the .04217 ratio.

Moreover, it appears that—in the case of seven plaintiffs—the result obtained by dividing the "Relative distribution (based on defendants' calculations)" by the "Defendants' damage calculations" remains at a constant .59725.[10] The parties again do not explain how or why that ratio of .59725 was applied to determine the relative distribution figures.

Accordingly, the Court recommends that the parties jointly provide an explanation of the system used to arrive at the relative distribution figures based on their damage calculations, and the rationale for the methodology used to arrive at these relative distribution figures.[11]

Furthermore, the Court is concerned that the Revised Settlement Agreement still does not explain the process by which counsel arrived at the actual distribution figure for each plaintiff. In fact, the relationship between the relative distribution based on plaintiffs' calculations, the relative distribution based on defendants' calculations, and the actual distribution oscillates dramatically. For example, Felipe de la Cruz and Jorge Orozco Vega present the only two cases in which defendants' relative distribution is greater than the plaintiffs' relative distribution. The

---

[10] The Court notes that the case of Yendy Dominguez provides an example in which the ratio of damage calculations to relative distribution is .59723.

[11] As a reflection of the necessity for a rationale for applying a constant ratio to arrive at the relative distribution figures, it is unclear why plaintiffs and defendants did not alter their application of their respective ratios in the case of Pedro Acosta, whose actual distribution figure is an "[o]utlier due to strong evidence produced." (5/18/18 Ltr., Ex. C).

9

Court attempted to decipher a systematic method by which plaintiffs' relative distributions and defendants' relative distributions were used to arrive at the actual distribution but found none. The Court respectfully recommends that until counsel provides an explanation of the methodology used, the settlement not be approved.

An additional concern raised in the April Report and Recommendation was that "the parties have not provided any information to explain the settlement amounts awarded to the three opt-in plaintiffs, Filipe De La Cruz, Jorge Orozco Vega, and Miguel Dominguez." (4/26/2018 R&R at 7).

The Revised Settlement Agreement only responds to that concern to the extent that plaintiffs include their calculations and that plaintiffs' and defendants' applications of respective ratios to arrive at the relative distribution figures were constant in the cases of the three opt-in plaintiffs. However, as with the other five plaintiffs, counsel fails to explain the method for arriving at the actual distribution figures. Accordingly, the Court respectfully recommends that the parties provide information as to the methodology used to calculate the payment of all plaintiffs before the settlement is approved.

3. Consideration of Certain Evidence

As mentioned above, the letter submitted by plaintiffs in accordance with this Court's prior Report and Recommendation attempts to explain the strategy used to distribute the settlement. (See generally 5/18/18 Ltr.) The second prong of the methodology described in plaintiffs' letter raises additional concerns regarding the Revised Settlement Agreement. Specifically, plaintiffs explain that they "also further adjusted the settlement distribution based on each [p]laintiff's evidence in support of their claims." (Id. at 2). Specifically, plaintiffs' counsel notes that "some [p]laintiffs presented far more credible evidence that they were

10

employees of [d]efendants than others." (Id.) The letter specifically addresses the case of Pedro Acosta. (Id.) He presents the only case in which a plaintiff's actual distribution is greater than the plaintiff's relative distribution and the defendants' relative distribution.

Plaintiffs explain the exception by arguing that Acosta "was in possession of company uniforms that he wore during his alleged employment." (Id.) Accordingly, plaintiffs claim that he was "far more likely to prevail in his claims that he was a Diligent employee than other [p]laintiffs who were not in possession of such evidence." (Id.) Plaintiffs allege that the strength of evidence that a given plaintiff was a Diligent employee—and consequently, the likelihood that a given plaintiff would prevail in his claim that he was a Diligent employee—influenced the distribution of the settlement awards. However, counsel fails to explain the types of evidence, apart from Mr. Acosta's uniform, that were considered. Furthermore, it remains unclear as to whether these standards were applied to each plaintiff with equal rigor. Rather than providing an explanation of a methodology for systematically considering the strength of evidence for a claim of employment, plaintiffs' letter focuses exclusively on the case of Pedro Acosta, who "was in possession of company uniforms that he wore during his alleged employment." (Id.) Possession of company uniforms is one type of evidence that can be considered in determining the strength of a claim of employee status. See, e.g., Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 191 (S.D.N.Y. 2003). However, possession of a company uniform is far from the only type of evidence that is proper to consider in assessing a claim of employee status.

Indeed, the United States Department of Labor summarizes the factors that are to be considered in assessing the difference between an employment relationship and a contractual relationship. The Department of Labor emphasizes the following seven factors: "[(1)] the extent to which the services rendered are an integral part of the principal's business, [(2)] the

11

permanency of the relationship, [(3)] the amount of the alleged contractor's investment in facilities and equipment, [(4)] the nature and degree of control by the principal, [(5)] the alleged contractor's opportunities for profit and loss, [(6)] the amount of initiative, judgment, or foresight in open market competition with other required for the success of the claimed independent contractor, [(7)] the degree of independent business organization and operation." See Fact Sheet 13: Employment Relationship Under the Fair Labor Standards Act (FLSA), United States Department of Labor, available at https://www.dol.gov/whd/regs/compliance/whdfs13.pdf (last visited October 29, 2018).[12]

Beyond a general implication that particularly strong evidence of employment was correlated with a larger award in the settlement distribution, counsel fails to provide an explanation of precisely how the strength of the evidence supporting a claim of employee status and the likelihood of prevailing in such a claim affected or dictated the exact settlement distribution.

The lack of clarity as to the methodology used to consider evidence in support of a claim of employee status and as to the types of evidence that were considered generates concerns as to whether there was adequate consideration of multiple types of evidence or information, as opposed to a litmus test comprised simply of a single factor (such as possession of company uniforms).

Given counsel's failure to specify the types of evidence of employment that were considered and the way in which the evidence was considered, the Court is concerned that

---

[12] As an example of the way in which factors other than uniform possession affect the employment classification, consider that the duration of Kelvin Burgos' relationship with Diligent—5 years, 7 months, and 3 days—may suggest a degree of permanency that is associated with an employment relationship.

12

adjusting the settlement distribution based on the strength of evidence has a disproportionately disadvantageous effect on those plaintiffs who happen not to possess the types of evidence that counsel considered. For example, Pedro Acosta worked for Diligent for 3 years, one month and 21 days. He worked 13 hours overtime per week and was awarded $5,892.00. On the other hand, Kelvin Burgos worked for Diligent for 5 years, 7 months, and 3 days. He worked 16 hours overtime per week and was only awarded $5,237.33. In other words, Burgos, who worked for Diligent for almost two and a half years longer than Acosta did and worked 3 hours per week *more* in overtime than Acosta, is awarded $654.67 *less* than Acosta. The Court is concerned that the mere fact that Pedro Acosta possesses company uniforms, for example, does not justify the disproportionality of Acosta's settlement and does not outweigh the discrepancy in employment duration and in hours overtime worked per week.

In sum, the Court recommends that counsel provide a detailed and substantive explanation of: a) the methodology used to determine the total settlement sum; b) the distribution of the settlement among the eight plaintiffs; and c) the evidence considered in support of each plaintiff's claim of employee status, as opposed to independent contractor status.

B. General Release Language

The April Report and Recommendation also recommended that the "parties revise the general release provision of [the] Settlement Agreement." (4/26/18 R&R at 12). The Revised Settlement Agreement has addressed the asymmetry of the language with respect to the parties by limiting the parties that plaintiffs are releasing. Specifically, the Revised Settlement Agreement defines the "Releasees" to include, "Diligent, its parent, subsidiaries, and representatives . . . including Curcio and Browne, and any other individual or entity that may be alleged to have been Plaintiff's 'employer' based on Plaintiff's providing delivery services."

(5/18/18 Sett. Agr.[13] at 4). Unlike the general release language in the initial Settlement Agreement, the new general release language of the Revised Settlement Agreement no longer encompasses Diligent's "affiliates, commonly owned entities and other related entities, Diligent's customers for which any of the plaintiffs performed services through Diligent including but not limited to Auto Parts International, and each of their incumbent and former officers, directors, owners, shareholders, investors, agents, attorneys, employees, fiduciaries, successors [and] assigns." (10/9/17 Sett. Agr. at 4-5).

However, the revised general release language does not address all of the concerns raised in the April Report and Recommendation. The initial Settlement Agreement included "a waiver of claims that [p]laintiffs know about and claims that they may not know about." (Id. at 4). The April Report and Recommendation cited Mobley v. Five Gems Mgmt. Corp, which noted that "'[r]elease clauses may not 'purport to waive practically any possible claim against the defendants, including unknown claims . . . .'" (4/26/18 R&R at 8 (quoting Mobley v. Five Gems Mgmt. Corp., No. 17 CV 9448, 2018 WL 1684343, at *3 (S.D.N.Y. Apr. 6, 2018) (quoting Lopez v. Nights of Cabiria, LLC, 96 F. Supp. 3d 170, 181 (S.D.N.Y. 2015)))). Despite this concern, the Revised Settlement Agreement preserves the language regarding "unknown claims," releasing defendants from "any and all actions, charges, causes of action, complaints, claims, and liabilities of any kind or nature whatsoever, known or *unknown*." (5/18/18 Sett. Agr. at 4, (emphasis added)). Furthermore, the Revised Settlement Agreement details that the release "includes a waiver of claims that [p]laintiffs know about and claims that they might not know about. (Id. at 5). A claim that a plaintiff "might not know about" is, operationally, a claim that

---

[13] Citations to "5/18/18 Sett. Agr." refer to the revised settlement agreement, which is Exhibit A of the 5/18/18 Ltr.

14

is "unknown" to the Plaintiff; thus, the concern as specified in the April Report and Recommendation remains. Accordingly, the Court repeats its earlier recommendation that the parties remove or substantially revise the language in the general release that refers to "unknown" claims or claims that plaintiffs "might not know about."

Additionally, the revised general release language does not address the Court's concern about the range of claims from which the initial Settlement Agreement releases defendants. The April Report and Recommendation noted that the general release provision of the initial Settlement Agreement "is not limited to wage-and-hour issues." (4/26/18 R&R at 8). Specifically, the release included causes of action such as "discrimination, harassment . . . unjust enrichment . . . [and] fraud." (Id.) The Revised Settlement Agreement continues to contain this language and reflects no revision of the causes of action from the earlier agreement. (Compare 10/9/17 Sett. Agr. at 4 with 5/18/18 Sett. Agr. at 4). Accordingly, the Court recommends, for the reasons set forth in the April Report and Recommendation, that the parties narrow the range of claims from which the settlement releases defendants, and eliminate claims that do not relate to wage-and-hour issues.

C. Limitation of Future Employment Provision

The April Report and Recommendation recommended that "the parties remove or substantially revise the provision titled 'No Future Employment Relationship' from the Settlement Agreement." (4/26/18 R&R at 14). That provision has been removed from the Revised Settlement Agreement. (Compare 10/9/17 Sett. Agr. at 6, with 5/18/18 Sett. Agr. at 5-6; see also 5/18/18 Ltr. at 3). The Court recommends no further action with this section.

D. <u>Attorneys' Fees and Costs</u>

The April Report and Recommendation recommended that counsel "provide time sheets and the appropriate documentation" to enable the Court to perform a lodestar crosscheck to verify the reasonableness of the attorneys' fees requested. (4/26/18 R&R at 16).

Exhibit D to the May 18, 2018 letter provides attorney time records for plaintiffs' counsel. (5/18/18 Ltr., Ex. D). Exhibit E provides the records of expenses in support of the claim that the costs are $1,377.50. Specifically, plaintiffs' counsel indicated that they incurred approximately $61,192.58 in attorneys' fees but are only requesting $15,220.50 in fees as part of this settlement. (5/18/18 Ltr. at 4). Upon review of the records, the Court finds plaintiffs' counsel's request for attorneys' fees to be reasonable, and respectfully recommends that they be approved.

## CONCLUSION

Having reviewed the parties' submissions and the Revised Settlement Agreement, conducted a fairness hearing with the parties, and being very familiar with the issues involved in this case throughout the course of these Reports and Recommendations, the Court respectfully recommends denying the motion to approve the Revised Settlement Agreement without prejudice to resubmit the Agreement with the changes outlined above, and with further explanation as to the methods used to calculate and distribute the award among plaintiffs.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; <u>Caidor v.</u>

Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
November 2, 2018

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York